**GRAPHIC ARTS INTERNATIONAL UNION, AFL–CIO, Plaintiff,**

v.

**GRAPHIC ARTS INTERNATIONAL UNION, LOCAL NO. 529 (AFL–CIO), a/k/a Graphic Arts Union, Local 529, (AFL–CIO) and Helen Herring, President and Larry Huston, Secretary-Treasurer/Business Agent, Officers of Graphic Arts International Union, No. 529 (AFL–CIO), Defendants.**

No. 81–6080–CV–SJ.

United States District Court,
W. D. Missouri,
St. Joseph Division.

Jan. 14, 1982.

David Whipple, Whipple & Kraft, P.C., Kansas City, Mo., Charles A. Werner, Schuchat, Cook & Werner, St. Louis, Mo., for plaintiff.

Ronald S. Reed, Stephen Briggs, St. Joseph, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

SACHS, District Judge.

This is an action brought by Graphic Arts International Union, AFL–CIO ("GAIU" or "the International") against Graphic Arts International Union, Local 529 (AFL–CIO) ("the Local") and two of its officers. The issues are framed in three counts in the First Amended Complaint, filed October 29, 1981, and by defendants' answer and counterclaim filed October 30, 1981. Jurisdiction is alleged under 29 U.S.C. § 185(a), 29 U.S.C. §§ 462, 464, and 29 U.S.C. § 501. Plaintiff seeks to have defendants enjoined from interfering with imposition of an emergency temporary administrator upon the local (a trusteeship), and from disaffiliating with the international, and to have an accounting of the local's assets and their distribution. Defendants counterclaim for injunctive relief from interference by the international in the affairs of the local and the administration by the local of contracts with employers with whom the local allegedly has contracts. A hearing was held November 2, 1981, and November 11, 1981. The parties agreed that the hearing was for the purpose of both preliminary and permanent relief and the trial of the action on the merits was therefore advanced and consolidated with the hearing on the preliminary

# 589

injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. The following constitutes the findings of fact and conclusions of law of this Court pursuant to Rule 52(a).

The local was Local 9B of the International Brotherhood of Bookbinders when that union merged with the Lithographers and Photoengravers International Union in 1972, to become the Graphic Arts International Union. Herring and Norton testimony; Plaintiff's Exh. 3. Under the constitution of the new international, the local automatically became an affiliate as though chartered by GAIU. Plaintiff's Exh. 3, § 2.1.A at page 26. On October 1, 1977, a new charter was issued in the name of Local 529, which was formed from a merger of three locals of the international, including 9B. The locals of GAIU are subject to the international to the extent specified in the constitution and by-laws of the international, but "in respect to all other matters each Local is subject only to its membership." *Id.* at § 1.1. A primary duty of the local is to submit fees to the international, including per capita taxes and special assessments. *Id.* at § 22.9. Local 529 did so from the creation of GAIU in 1972 through August, 1981. None were paid for September or later. Huston testimony. If no per capita dues are paid for three months, a local is considered delinquent and not in good standing. Norton testimony. Local union dues or assessments are determined and retained locally and are not subject to international regulation. *Id.* The employer of the overwhelming majority of the local's members, Mead Products, has been holding all dues collected through the check-off procedure since it was notified of this dispute. Hackel testimony.[1] The local is considered a relatively large one, and per capita taxes are generally in the range of $4,000 per month. Norton testimony. The local has received from the international various benefits, including sacrifice benefits in 1979 and 1980 of approximately $180 per

member employed at Mead, and strike funding in 1974 of $30,000 per week for eight weeks. Herring and Metzinger testimony. Several witnesses also testified that the international sent various representatives to participate in contract negotiations at Mead. It is not necessary to evaluate the services rendered by the international, as compared with the cost of affiliation. Whether affiliation was beneficial or not was and is a matter for decision by the membership subject to democratic processes and lawful constitutional restrictions.

It is difficult to pinpoint precisely when the local members' dissatisfaction with affiliation with GAIU began. There was some evidence that they opposed the Bookbinders' merger, and that they did not consider their trade to have a common ground with the dominant groups in GAIU. In any event, the hard-fought negotiations for the 1979 Mead contract, Plaintiff's Exh. 14, led to some bitter feelings among the members that the international was not giving them sufficient backing, or that they had otherwise received a less than favorable contract agreement. *E.g.*, Huston testimony. Apparently there have been general discussions since that time of doing something about changing affiliation, but nothing formal was undertaken until the summer of 1981. The Mead contract is still in effect and does not expire until October 31, 1982. That contract recognizes "Graphic Arts Union, Local 529 (AFL–CIO)" as the bargaining agent for unit employees. Plaintiff's Exh. 14 at 1, 49–50.

The disaffiliation issue was raised during the spring officers' elections. Placing the local's money "elsewhere" was also discussed by the executive board as early as May. Defendants' Exh. 3. Huston, around the beginning of July, 1981, talked with stewards and other individuals from each department at Mead to determine the extent of the problem. He stated that "no one" he talked to was "for staying with the

1. Larry Huston, the Secretary-Treasurer/Business Agent of the local, testified that he received only one check-off from Mead after October 3, which was deposited by him in a new account for Local 29, UPIU. Huston, who is a defendant, and defendant Helen Herring, the President of the local, were last elected to office in the spring of 1981 for a three-year term.

GAIU." Also in July, Huston was authorized to go to Washington, D. C., to discuss disaffiliation with an attorney employed by the United Paperworkers International Union.[2] Herring testimony. Minutes of executive board meetings reflect that on August 27, it was resolved that the President, Secretary-Treasurer and Second Vice-President were "authorized and directed to make all necessary action to preserve and make available for whatever reasons necessary to Local 529 all funds now the property of local 529." Defendants' Exh. 3. Special meetings regarding the funds and disaffiliation were also discussed at that meeting and on September 8, 1981. It was determined that some funds would be kept available for operation, Huston's salary and some other expenses paid a few months in advance, and "all other union funds will be protected, with Larry, Helen and Orville the only members knowing where the money is being held." A motion was made at a September 11 executive board meeting, after a meeting of the board with counsel for the local, to "attempt to refund the money to the membership"; the motion died for lack of a second. However, on September 16, a pro rata share plan based on departmental seniority was discussed, which was detailed and approved at a September 18 meeting.

Meanwhile, notices were posted of the scheduled special meetings. The notices went up on September 15 and petitions were circulated "requesting" the meetings which were returned on September 17 or 18 (the results seem to have been a foregone conclusion). Plaintiff's Exhs. 6–9. The disaffiliation meeting was also advertised in the local labor newspaper. Defendants' Exhs. 1, 2, 7, 8; Herring testimony. Some time before the first of the two special meetings on September 24, the funds of the local were transferred to a new account and cashiers' checks drawn up for the pro rata

disbursement. Huston testimony. A separate amount was earmarked for refund at the October 3rd meeting of an assessment that was paid in over the summer (the pro rata share disbursement totalled some $74,000–$75,000; the refund of the assessment approximately $9,000). Funds of $4,000–$5,000 remained in the treasury after the disbursement and refund amounts were withdrawn.

On September 24, approximately 495 of the 700–800 total members attended the special meeting at which funding was discussed. This was a large and apparently representative attendance. A vote was held on the disbursement formula, with the "in favor" vote "impossible to count," Herring testimony, but only one vote in opposition and seven abstentions. *Id.* A separate vote was then taken on refunding of the assessment, which also was approved. The disbursement was carried out by distribution of the cashier's checks personally to members who picked them up at the union hall, beginning the same day. A record was kept of the amounts of the checks, with members signing a list when they picked them up. Defendants' Exh. 12. The assessment refund was made in cash after the second special meeting October 3rd, with each member who had paid in either $5.00 (one month) or $10.00 (two months), receiving $6.00 or $12.00, respectively, in return. Defendants' Exh. 11; Defendants' Exh. 3; Herring testimony.

On October 3, 1981, votes were taken by ballot on the disaffiliation question. Herring testimony; Plaintiff's Exh. 10. The count in favor of disaffiliating was 584, against, 53, and 3 who "didn't care." The sentiment for disaffiliation apparently crosses all "factional" lines within the local and includes all leadership elements. No person has been identified by name as a

---

**2.** That international was hardly chosen at random. Prior to the 1972 merger, the pension plan was negotiated on a company-wide basis, primarily through UPIU. A Kalamazoo local of UPIU (the 1971 pension negotiations took place in Kalamazoo and there has apparently been some contact between the locals) was sent

$5,000 pursuant to the executive board's decision at a meeting September 16, 1981. UPIU representatives attended *June* and *July* executive meetings. The September 8th executive board minutes state that three other Mead plants had UPIU locals. Defendants' Exh. 3.

leader of the small "loyalist" minority opposing disaffiliation. After the count on this issue was completed by the election committee of five members, Huston addressed the subject of affiliation with a different international, stating that the UPIU "looked good." Herring testimony. A stand-up vote was taken, which indicated that everyone still at the meeting (seven had left between the votes) favored affiliating with UPIU. *Id.* Later that evening, UPIU presented the officers with a charter for new Local 29. *Id.*; Plaintiff's Exh. 20.[3]

An International Council of the GAIU is the governing body of the international between the conventions that are held every three years. It is made up of international officers and persons elected from various regions of the union. Norton testimony; Plaintiff's Exh. 3. Following the October 3, 1981, meeting, Norton reported to the council on the facts of the disaffiliation and new affiliation votes of the local, the "bankruptcy" of the local, and what collective bargaining obligations the local had. The council voted to suspend officers Huston and Herring and to bring charges against them, and also to apply the international's emergency administration provisions. Norton testimony. Notices were sent by certified mail to Herring and Huston advising them of the charges and of the appointment of Donald Hackel as temporary administrator of the local, directing them to turn over all records and assets to Hackel. The "financial malpractice" basis stated for the action was "that you have disbursed funds among members of the Local as part of a disaffiliation campaign, and are continuing to collect per capita monies due to the International, and dues owed to GAIU Local 529 while at the same time attempting to disaffiliate." Plaintiff's Exh. 11. The certification of the appointment of Hackel states that the purpose of imposing emergency administration and suspending the

officers is "correcting financial malpractice by the President and the Business Agent." Plaintiff's Exh. 12.

A notice was sent to all members of the local by GAIU informing them of the temporary administrator and his role, and presenting its viewpoint on what had occurred. Plaintiff's Exh. 13. The text generally conveys a message that the members have been "misled" by the officers' actions. It also states that the GAIU "is obtaining a preliminary injunction and order from the U.S. District Court to compel the Local to turn over to Temporary Administrator Hackel all books, records, papers, funds, and property held by the Local." The disbursement of funds is referred to as amounting to "a monetary bribe for a vote of disaffiliation." If pertinent, it appears that the official leadership was the last to submit to disaffiliation sentiment within the local, and the Court does not accept the theory that monetary considerations motivated the final overwhelming vote.

There is no specific provision in the GAIU's international constitution regarding "disaffiliation." There are references to withdrawal of a charter or surrendering a charter, neither of which technically applies in these circumstances.[4] See Plaintiff's Exh. 3. "Disaffiliation" from an international, however, is not a novel concept. The effect of an attempted disaffiliation has been examined more frequently from the aspect of identification of the collective bargaining representative of a group of employees than it has been in terms of validity of a trusteeship.

In *St. Vincent Hospital v. N. L. R. B.,* 621 F.2d 1054 (10th Cir. 1980), the Court of Appeals granted the Board's application for enforcement of an order to recognize and bargain with a local as the successor to the local with which the company had a collec-

---

**3.** International officers of both unions were present in St. Joseph on October 3rd. James Norton, the GAIU international financial secretary, was allowed to speak at the meeting for a few minutes before the vote. Norton testified that he was satisfied as to the secrecy and tabulation of the ballots.

**4.** It may plausibly be asserted that a surrender of charter was attempted. As will be discussed, however, it is the Court's view that no surrender occurred and that at least a "phantom local" affiliated with GAIU still exists.

tive bargaining agreement. The local had "terminated its association" with a state organization, *id.* at 1055, affiliated with a national union, and changed its name. The company argued that the new affiliation "resulted in a substantial change in the bargaining representative, thereby raising a representation question that could only be resolved by a Board conducted election." *Id.* at 1056. The Court found substantial evidence to support the Board's finding that "the continuity of the bargaining representative was preserved" and that no representation issue was presented. Factors considered included retention of the same officers and the lack of significant change in the autonomy of the local.

Under the same analysis of whether the continuity of the organization had been preserved, the Fourth Circuit has enforced a Board order to bargain with a local after surrender of its charter and affiliation with a new international, and an accompanying change of name. *National Labor Relations Board v. Harris-Woodson Co.*, 179 F.2d 720 (4th Cir. 1950) (where "great bulk" of membership and officers are same, it was "same labor organization" for purposes of a bargaining order).

If such continuity of organization is preserved, the Board does not need to apply its contract bar rule, *see, e.g., General Cable Corp.*, 51 LRRM 1444 (1962), or determine whether a "schism" exists to provide an exception to the contract bar, because no election is necessary to transfer representation authority to the "new" (*i.e.*, successor) local. The local with the new name and affiliation has been determined to be the same organization and continues to be the bargaining representative under those circumstances. Where two labor organizations purport to represent the same employees, there may be a determination that a schism exists within the local; this situation warrants a new election even during the contract term to settle the confused representation question. *E.g., N. L. R. B. v. Circle A & W Products*, 647 F.2d 924 (9th Cir. 1981); *The Louisville Railway Co.*, 26 LRRM 1261, 1262 (1950). But the local with the new name and affiliation could still be found to have such continuity of organization that it is the bargaining representative, and the "old" name and affiliation local found to be an outsider and precluded from petitioning for an election by the contract bar rule. *Louisville Railway Co., supra.*

*Louisville Railway* has been followed in cases which factually resemble the instant circumstances in various respects. In *Prudential Insurance Co.*, 32 LRRM 1449 (1953), a local voted to disaffiliate from the international and form a new union. All assets and property were transferred and officers retained. The international suspended the local and appointed a trustee to take over the local's affairs. Both sought recognition and the employer petitioned the Board, which found that the newly formed successor continued to represent the employees and the minority group which had remained in the "old" local was now the rival and was precluded by the contract bar from seeking a change in representation. Enforcement of a Board order which held that a "new" local was not the successor to the one which was a party to a collective bargaining agreement, and that the attempt by that "new" local to enforce the union security clause was an unfair labor practice, was denied in *N. L. R. B. v. Hershey Chocolate Corp.*, 297 F.2d 286 (3rd Cir. 1961). The Court found that the "same local merely changed its international hat." *Id.* at 291. It agreed with a prior arbitration decision which found, *inter alia*, that the old local was maintained after the disaffiliation and new affiliation votes only on a " 'paper or phantom basis, without substance, and solely by [the international] as an outpost. . . .' " *Id.* at 289.

As the representation question is for the Board to determine in the first instance, *e.g., St. Vincent Hospital v. N. L. R. B., supra*, the primary point of this discussion is to illustrate the reasons why this Court cannot grant either party relief as to a declaration or an injunction which affects their administration of contracts with employers. The Court has no authority to

determine *who* is the *collective bargaining representative* of employees within any given bargaining unit. The question that is properly before the Court is whether Local 529 of the GAIU continues to exist at all as a legal entity, and, if so, did the international validly impose a trusteeship which can be enforced on that local. In finding, *infra*, that the trusteeship is valid, the representation rights of the present or former members are not foreclosed. "The procedures of the National Labor Relations Board remain open to them." *Watts v. Chemical Workers*, 89 LRRM 2639 (E.D. Wash.1975). While the Court might suppose that the Labor Board would give effect to the transition sought by the employees, this is a labor law question which is within the exclusive primary jurisdiction of the Board.

■ Under the provisions of the international constitution, which this Court has jurisdiction to interpret pursuant to § 301 of the LMRA, 29 U.S.C. § 185(a), *Local 37 v. Sheet Metal Workers*, 655 F.2d 892, 895 (8th Cir. 1981), the local remains viable as long as at least seven members oppose surrender of the charter. Plaintiff's Exh. 3, see, *e.g., Basilicato v. Int'l Alliance*, 479 F.Supp. 1232, 1244 (D.Conn.1979), aff'd without opinion, 628 F.2d 1344 (2d Cir. 1980). The "nay" votes on the disaffiliation question exceeded seven and must be construed as indicating a desire to retain the GAIU charter. Again, the question of who remains a member of Local 529 and who does not, or who Local 529 may validly claim to represent in collective bargaining, is not answered by this finding. It is at least possible that the 53 dissenters now acquiesce in the majority decision, and that Local 529 is a "phantom" outpost of GAIU.

Was the imposition of a trusteeship (emergency administration) over whatever remains of Local 529 valid? Purposes for establishing a trusteeship are limited by statute to "correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization." 29 U.S.C. § 462. It must also be in accordance with the provisions of the international's constitution and by-laws. *Id.* The GAIU constitution allows imposition of emergency administration only for "the purpose of correcting corruption or financial malpractice." Plaintiff's Exh. 3, § 20.12 at page 18. An eighteen-month presumption of validity attaches to a trusteeship which is imposed in accordance with the constitutional provisions and is "subject to attack" only "upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title." 29 U.S.C. § 464(c); *Higgins v. Harden*, 644 F.2d 1348, 1351 (9th Cir. 1981); *Atlanta Fed. & City Serv. Emp. v. SEIU*, 441 F.2d 1115, 1116 (5th Cir. 1971).

■ Therefore, under the GAIU constitution and the reasons stated by the international for imposition of the trusteeship, the question is whether the local has shown by "clear and convincing proof" that the trusteeship (emergency administration) was *not* established for the purpose of correcting financial malpractice.[5] There has been no allegation of corruption or diversion of as-

---

5. Corruption, the only other valid basis under the GAIU's constitution for the measures taken, has never been alleged. A move to disaffiliate by a local has been used to justify the imposition of trusteeships, with mixed results. Finding it a basis for a trusteeship, see *Exec. Bd., Local 1302 v. United Bro. of Carpenters*, 477 F.2d 612 (2d Cir. 1973); *Nat'l Ass'n of Letter Carriers v. Sombrotto*, 449 F.2d 915 (2d Cir. 1971) ("union is entitled to protect itself"); *McVicker v. Int'l Union, Dist. 50*, 327 F.Supp. 296 (N.D.Ohio 1971). Finding that no valid basis existed, see *Benda v. Grand Lodge of Int'l*

*Ass'n*, 584 F.2d 308, 317 (9th Cir. 1978) ("Union preservation, standing naked and alone, is not sufficient to justify imposition of a trusteeship"); *United Bro. of Carpenters & Joiners v. Brown*, 343 F.2d 872 (10th Cir. 1965) (imposition to force affiliation with a district council invalid). However, these cases were under the statutory purposes of "collective bargaining" or "legitimate objects," which are not involved in the instant case due to the stated purposes of the international and the limitations of its constitution.

sets for the personal use of the officers against the wishes of or without the knowledge of the membership. The type of misconduct perhaps most frequently envisioned, *e.g., Sheet Metal Workers v. Commarato*, 92 LRRM 3619 (S.D.N.Y.1976), aff'd, 95 LRRM 2215 (2d Cir. 1977), is not present here. The officers, in polling their membership, setting up the special meetings, and arranging for the disbursement of funds, were acting in good faith in accordance with what they perceived to be (and apparently were) the preferences of the overwhelming majority of the membership. However, "financial malpractice" as perceived by the international is inclusive of the effect of the actions taken by the officers and the members, even though taken in good faith. Financial records, the assets remaining after the approved disbursement, and most particularly the check-off for per capita taxes during the period of unquestioned affiliation, which the local was to have passed on to the international, still belonged to Local 529 as an organization. No local officers remained loyal to 529 as an entity, as they believed it no longer existed, and could not properly administer whatever funds it is still entitled to obtain. Considering the presumption of validity and the judicial policy supporting "the process of imposition of trusteeships under union determination," *id.* at 3621, and the standard by which this Court must view its analysis, a trusteeship over the remnants of Local 529 will be enforced.

Neither this finding nor the particular circumstances of this case warrant any further relief against the individual defendants under Count III, alleging breach of fiduciary duty in violation of 29 U.S.C. § 501. First, even assuming that upon imposition of the trusteeship, the international stood in the shoes of the local organization itself, cases which have addressed this issue have found the statute did not confer a federal cause of action upon the labor organization of which the defendants were officers, but only upon its members. *E.g., Local No. 512, IBT v. Baker*, 473 F.Supp. 1120 (M.D.Fla.

1979); *Safe Workers Organization, Chapter No. 2 v. Ballinger*, 389 F.Supp. 903 (S.D. Ohio 1974). Second, under the statute, leave of court must be obtained prior to bringing suit upon verified application and for good cause shown. *Id.*; 29 U.S.C. § 501(b). Moreover, the conduct shown in this action does not seem to rise to the level of a breach of a fiduciary duty, where the local members to whom the primary duty was owed and who are the protected parties under the statute, approved the actions by a large majority, with full disclosure of the reasons and circumstances. Any action taken by the officers (who personally opposed the disbursement of funds) was in good faith reliance upon and in response to that approval. Accordingly, judgment is hereby

ORDERED in favor of the plaintiff and against defendants to the extent that:

The trusteeship (emergency administration) imposed by plaintiff upon defendant Local is found valid and the defendants are enjoined and restrained from interfering with the powers of the GAIU, pursuant to Part I, Article XX, Section 20.12 of its Constitution to take emergency measures against defendant Local 529 for the purpose of correcting financial malpractice, including the appointment of a temporary administrator, who shall be entitled forthwith to take over and to hold for the exclusive benefit of the membership all books, records, papers and assets owned by Local 529. Defendants shall turn such books, records, papers and assets over to the temporary administrator, including funds which remained in the local treasury on October 3, 1981, when defendant officers ceased to function as officers of Local 529 of the GAIU.

■ It is further ORDERED that all other relief sought by plaintiff upon plaintiff's first amended complaint and the relief sought by defendants upon their cross-claim is denied. This Order shall not be deemed to have any effect upon the membership or representation rights of any party.[6]

---

**6.** While it might serve the convenience and practical needs of the parties and of the em-

ployer to rule whether the new local union should be considered a successor to the repre-

sentation rights of Local 529, the Court's view that this is a question for the Labor Board is bolstered by a very recent Eighth Circuit deci-sion. *Local Union 204, IBEW v. Iowa Electric Light and Power Company,* 668 F.2d 413 (8th Cir. 1982).