845 F.2d 687
 128 L.R.R.M. (BNA) 2259, 108 Lab.Cas. P 10,455
 INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP
BUILDERS, BLACKSMITHS, FORGERS, AND HELPERS,
AFL-CIO, et al., Plaintiffs-Appellees,
v.
LOCAL LODGE 714, INTERNATIONAL BROTHERHOOD OF BOILERMAKERS,
IRON SHIP BUILDERS, BLACKSMITHS, FORGERS, and
HELPERS, AFL-CIO, et al., Defendants-Appellants.
 No. 87-2244.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 16, 1988.
Decided April 22, 1988.
 
 Richard J. Tupper, Cornfield & Feldman, Chicago, Ill., for defendants-appellants.
 Bernard M. Mamet, Bernard M. Mamet & Assoc., Ltd., Chicago, Ill., for plaintiffs-appellees.
 Before POSNER, EASTERBROOK and MANION, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 This appeal from the grant of injunctive relief in a suit between two labor unions requires us to explore the esoteric question of when a parent union may impose a trusteeship on a local under section 302 of the Landrum-Griffin Act (formally, the Labor-Management Reporting and Disclosure Act of 1959), 29 U.S.C. Sec. 462. See generally Bellace, Union Trusteeships: Difficulties in Applying Sections 302 and 304(c) of the Landrum-Griffin Act, 25 Am.U.L.Rev. 337 (1976). The principal plaintiff is the international boilermakers' union, and the defendants are one of its locals, Local Lodge 714, and the local's former officers. Members of the international union who disagreed with the union's leadership over dues and other matters formed a rival union, the Independent Workers of North America, after losing an election for officers of the international. The rival began trying to induce locals of the international to break away and affiliate with it. These efforts succeeded with Local Lodge 714, for 130 of its 135 members signed a petition to disaffiliate from the international boilermakers' union and subsequently voted 112 to 2 to disaffiliate, and to affiliate with the Independent Workers of North America instead. The officers of Local Lodge 714 then formed Local 15 of the Independent Workers of North America. The new local has the same officers as Local Lodge 714, and most of the members of the local lodge followed their leaders into Local 15; the record does not reveal how many (if any) remained in Local Lodge 714. The officers took with them both the books of Local Lodge 714 and its bank account, containing some $6,000 to $8,000, and they used some of this money to pay their salaries and other expenses of the new local.
 
 
 2
 Local Lodge 714 had been the exclusive bargaining representative of its members, who are production and maintenance workers employed at a plant owned by Quaker Industries. After the breakaway, Local 15 petitioned the National Labor Relations Board to order a new election for collective bargaining representative. Although the record turns murky at this point, it seems both that the petition was granted and that the workers voted for Local 15; for at argument the defendants told us, without being contradicted by their adversaries, that Local 15 is now the exclusive bargaining representative of the Quaker workers.
 
 
 3
 A few days after Local 15 had petitioned the Board for a new election, the international union, having already held a hearing on whether to impose a trusteeship on Local Lodge 714, voted to impose the trusteeship and appointed new officers for the lodge. The officers were brought in from the outside rather than selected from among members of the lodge; it is unclear whether by this time the lodge had any members left. The international union then brought this suit, under section 301 of the Taft-Hartley Act, 29 U.S.C. Sec. 185, which authorizes suits between labor unions as well as the more familiar suits between company and union or between an employee and a company or union. The suit sought an injunction enforcing the trusteeship, specifically by ordering the former officers of Local Lodge 714 to turn over the lodge's books and money to the trustee. The defendants--nominally Local Lodge 714 and its former officers, really Local 15 and its current officers (the same people)--counterclaimed under section 304(a) of the Landrum-Griffin Act, 29 U.S.C. Sec. 464(a). The district court, noting that section 304(c) provides that a trusteeship established in conformity with the procedural requirements of the union's constitution or bylaws and authorized or ratified after a fair hearing shall be presumed valid for 18 months, during which time it "shall not be subject to attack ... except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462," granted a preliminary injunction (since made permanent) authorizing the trustee appointed by the international union to run Local Lodge 714 and directing the individual defendants to hand over the Lodge's books and money to the trustee, which has been done. See 663 F.Supp. 1071 (N.D.Ill.1987).
 
 
 4
 There is a small procedural knot to untie before we get to the merits. The basis of the international's suit is unclear. Section 304(a) of the Landrum-Griffin Act does not authorize the parent union to bring suit against a subordinate unit or its members, or against anyone else; it only authorizes suit by a "member or subordinate body of a labor organization," or by the Secretary of Labor. Section 301 of the Taft-Hartley Act does, as we just mentioned, authorize a suit by one labor union against another, but only for breach of contract. The international has not cast its suit in breach of contract terms but merely asks for enforcement of the trusteeship.
 
 
 5
 Despite the inartful pleading, the suit is within the jurisdiction conferred by section 301 of the Taft-Hartley Act. The trusteeship provision, section 302 of the Landrum-Griffin Act, provides:
 
 
 6
 Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.
 
 
 7
 Section 302 thus does not confer any powers on parent unions (as distinct from "subordinate bod[ies]"); it merely limits the authority of those unions to exercise their contractual rights to impose trusteeships on their local affiliates. (The abuses of trusteeship that led to the enactment of section 302 are well described in Levitan, The Federal Law of Union Trusteeship, in Symposium on LMRDA 443 (Slovenko ed. 1961).) That is no doubt why section 304(a) empowers union members and subordinate bodies to sue to enforce section 302, but not the union imposing the trusteeship. Within the limits fixed by the statute the union can exercise whatever powers of imposing trusteeships it enjoys by virtue of its contractual relationship with its affiliates. The enforcement of a trusteeship is therefore a contract remedy which the union can seek under section 301 together with any ancillary relief of an equitable character that may be necessary to make the trusteeship effective. See National Association of Letter Carriers v. Sombrotto, 449 F.2d 915, 918-19 (2d Cir.1971) (Friendly, J.).
 
 
 8
 The defendants' first argument against the relief granted by the district court is that the local, having disaffiliated, is no longer a "subordinate body" of the international boilermakers' union and is therefore beyond the reach of any trusteeship permitted by section 302. This argument treats the statutory reference to subordinate bodies not as demarcating the scope of section 302 viewed as a limitation on the powers of unions to impose trusteeships, but as an additional limitation on those powers. Maybe it is, but this we need not decide. Section 302 forbids the union to impose a trusteeship except in conformity with the union's constitution and bylaws. Nothing in the constitution or bylaws of the international boilermakers' union authorizes it to impose a trusteeship on a local union that is not a subordinate of the international union; it cannot for example impose a trusteeship on a local of the teamsters' union. On the contrary, the constitution only authorizes the international union "to place any subordinate body under trusteeship."
 
 
 9
 Intermediate between the case of the securely affiliated local union and the local that is not a subordinate body because it is (and let us say, always has been) the affiliate of another international union is the case of a local that has succeeded in disaffiliating. Can its (former) parent impose a trusteeship on it? The international boilermakers' union wavers between arguing that it can and arguing that Local Lodge 714 did not succeed in disaffiliating. The international's constitution is ambiguous on the right to disaffiliate. It contains no provision authorizing disaffiliation and contains a provision making "secession or threatened secession" a ground for imposing a trusteeship, which could be taken either as an implied prohibition of disaffiliation or as recognition that disaffiliation will sometimes occur and authorization to do something about it. But in addition the constitution provides that "any Local Lodge having less than ten (10) active members shall be automatically disbanded and its Charter returned to the International Brotherhood, together with all books, records, properties, funds and assets (including trusts, trust funds or other trust properties held, operated or controlled by such Local Lodge) owned or held by such Local Lodge at the time of such disbanding, which shall become the property of the International Brotherhood." There is no necessary inconsistency, however, between this provision and the stricture against disaffiliation. Maybe Local Lodge 714 could not disaffiliate but if so many of its members quit that fewer than ten remained the lodge was automatically disbanded and its property reverted to the international.
 
 
 10
 Thus interpreted, the constitution seems to make the international's right to impose a trusteeship on a local depend on the local's retaining at least ten members. For if it dips below that number, the local disappears--there is nothing to impose a trusteeship on--and its assets revert to the international. The local is no longer a subordinate body of the international; it is no sort of body; it is nothing. So at least the defendants argue, adding that they presented persuasive evidence to the district court that Local Lodge 714 had in fact fewer than ten members when the international union voted to impose a trusteeship on it. The international union did not respond to the argument in its brief on appeal but at oral argument claimed that the constitution implicitly entitles it to feed in new members if it wants to prevent a local lodge from disbanding. The district court thought it unnecessary to determine how many members Local Lodge 714 had when the trusteeship was imposed.
 
 
 11
 We find this insouciance about the numbers puzzling. It is possible that as the international union argues (belatedly, having ignored the issue in its brief) the automatic disbandment provision of its constitution should not be read literally. But it is also possible that it should be, in which event there is a grave question whether the trusteeship was authorized by the constitution; and if it was not, then it was barred by section 302. See Flight Engineers Int'l Ass'n v. Continental Air Lines, Inc., 297 F.2d 397, 402-03 (9th Cir.1961), where an international union was held to be barred from imposing a trusteeship over a local union that had disbanded in accordance with the constitution and bylaws of the international.
 
 
 12
 The issue of disbandment would not be critical if, as the defendants also argue, there are other grounds for concluding that the trusteeship was unlawful. Section 302 limits trusteeships to the following purposes: " correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization." Neither nor is in play here. There is no argument that the transformation of Local Lodge 714 into Local 15 disrupted collective bargaining or that the transformation was not in accordance with the duly expressed preferences of the majority--the overwhelming majority--of the members of Local Lodge 714.
 
 
 13
 Purpose presents a closer question. The international is irate that Local 15 walked off with Local Lodge 714's books and money. But it might seem able to get all the relief it needs without imposing a trusteeship--either by invoking the forfeiture clause in the provision we quoted earlier from the international's constitution, or, if perchance that provision is not available because Local Lodge 714 did not disband (maybe), by invoking some other source of contractual or property rights referable to the union's constitution or bylaws. (However, as stressed in the Flight Engineers decision cited earlier, section 302 precludes resort to a concept of inherent power, irrespective of the union's constitution or bylaws, to impose a trusteeship.) So one might think that a trusteeship would not be necessary for the purpose just of preventing financial hanky-pank and hence that the only effect of imposing a trusteeship in such a case would be to make it more difficult for local unions or their members to secede and join rival unions.
 
 
 14
 This is not a bad argument, but accepting it would both cut against the grain of the statute and complicate its administration unduly. The statute authorizes a trusteeship in cases of "financial malpractice," which we interpret to include not only cases where local officers are lining their own pockets but also where they are diverting funds to a rival union, as they were doing here; and a trusteeship imposed in such a case will frequently be a device in whole or part for collecting money owed the international, taking the place of an accounting, a common law constructive trust, a receivership, and other devices that creditors use to enforce their rights. See International Brotherhood of Boilermakers v. Local Lodge D461, 663 F.Supp. 1031, 1034-35 (M.D.Ga.1987); Graphic Arts Int'l Union v. Graphic Arts Int'l Union, 529 F.Supp. 587, 594 (W.D.Mo.1982); International Brotherhood of Boilermakers v. Local Lodge D238, 678 F.Supp. 1575, 1580 (M.D.Ga.1988). We conclude that the trusteeship was a proper method for curing Local Lodge 714's financial malpractice even if less drastic methods would have sufficed--provided, however, both that financial malpractice was the (or a) bona fide purpose of the trusteeship and that Local Lodge 714 was not automatically disbanded for want of a quorum. For if it was, the international's only recourse under section 301 of the Taft-Hartley Act (the basis for federal jurisdiction in this case) was to enforce the forfeiture provision in its constitution, or any other contractual rights it might have, by the usual remedies for breach of contract, excluding trusteeship.
 
 
 15
 Turning to statutory purpose , we find the international wavering again. On the one hand it keeps saying that all it wants is its books and money back; but if so why doesn't it stipulate to the defendants' allegation that Local Lodge 714 dipped below ten members, declare the local disbanded, and ask for forfeiture of the books and money? It has steadfastly declined to seek forfeiture, and at oral argument in this court said it needs the trusteeship in order to preserve Local Lodge 714 in the hope of rebuilding it into a competitor of Local 15 for the support of the workers at Quaker Industries. Certainly a legitimate object of the international boilermakers' union is to compete effectively (and necessarily through locals) with its rival, the Independent Workers of North America. But there are two objections to using this point to establish the propriety of the trusteeship. First, the desire to preserve one's local is hard to distinguish from the desire to impede a competing international. If Local Lodge 714 can defect to the International Workers union, that will hurt the international boilermakers' union by depriving it of the shell into which it might pour new members and resources, but at the same time will help the Independent Workers of North America by obviating its having to create a new local from scratch. Conversely, if the members of Local Lodge 714 must quit and form a new union, the international boilermakers' union will be helped but the Independent Workers of North America hurt. Second, the district court refused to allow the defendants to present evidence that the imposition of the trusteeship was part of a campaign by the international union to prevent its locals from breaking away and affiliating with the Independent Workers, a campaign that, the defendants say, has as its objective nothing more edifying than a desire to weaken or destroy a rival--an inference lent some color by the international's angry reference in its brief to "outside forces." There was no good reason to exclude such evidence, because it bears on whether the trusteeship is consistent with the legitimate objectives of the international boilermakers' union.
 
 
 16
 The few cases that have opined on the question agree that a union's "legitimate objects" in imposing a trusteeship do not include preventing the secession of its locals, unless one of the other purposes in the statute (for example, preventing disruption of collective bargaining, as in Executive Board Local 1302 v. United Brotherhood of Carpenters & Joiners, 477 F.2d 612 (2d Cir.1973)) would be thwarted by the secession. See Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 317 (9th Cir.1978) ("Union self-preservation, standing naked and alone, is not sufficient to justify imposition of a trusteeship"); United Brotherhood of Carpenters & Joiners v. Brown, 343 F.2d 872, 881-83 (10th Cir.1965); cf. Tile, Marble, Etc. Int'l Union v. Granite Cutters & Marble Setters & Handlers, 621 F.Supp. 1188, 1193-94 (E.D.N.Y.1985). These decisions are plausibly related to the stated purpose of the Landrum-Griffin Act, which is to promote democratic control of unions. See 29 U.S.C. Sec. 401 (preamble); Sec. 411 (union members' "bill of rights"); Finnegan v. Leu, 456 U.S. 431, 436, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982). The ability of a local union to disaffiliate and join another union, like the ability of a consumer to switch to another seller, facilitates competition among unions. The word "legitimate" is not defined in the statute or illuminated by the legislative history, which emphasizes the legitimacy of using the trusteeship device to rid unions of Communists, see H.R.Rep. No. 741, 86th Cong., 1st Sess. 13-14 (1959), but it draws meaning from the statute's purpose. To read section 302 as authorizing the imposition of a trusteeship to prevent secession regardless of the reasons for the secession would serve that purpose poorly.
 
 
 17
 A counterargument could be mounted if the international boilermakers' existence were at stake. The language quoted above from the Benda case may sweep too broadly. An organization might conceivably lack minimum stability if each of its cells were free to depart at the drop of a hat, and if so it would not comport with the procompetitive policies of Landrum-Griffin to forbid unions to take any measures at all to impede secessions.
 
 
 18
 The issue of the legitimacy of secession is bound up with that of the right to the assets (forget the books). If the assets that the officers of Local Lodge 714 took with them to Local 15 belong to the international, allowing the new local to keep them would be a form of unfair, not fair, competition. It would amount to an involuntary transfer of resources from the international boilermakers' union to its arch-rival, the Independent Workers of North America, and would thus be subsidized competition. Cf. Weber, Local Union Trusteeship and Public Policy, 15 Ind. & Lab. Rel.Rev. 185, 193, 204-05 (1961). The international argues that, if so, it should be entitled to impose a trusteeship as a method of ensuring the return of the assets. (It does not argue that its existence is actually threatened by the defection of some of its locals to the Independent Workers of North America.) Yet that could be regarded as overkill. There are plenty of conventional legal and equitable remedies available to the international, in a suit under section 301 of the Taft-Hartley Act, to assure that the funds are returned to it. The trusteeship adds nothing except invalidation of the disaffiliation and hence return of the shell (Local Lodge 714) to the international. This may have symbolic, even practical, significance; maybe there is some impediment that we don't know about to the international's forming a new local, or maybe there is some goodwill attached to the name "Local Lodge 714." In any event, we have ruled that a trusteeship is authorized in cases of financial malpractice, which this case may be.
 
 
 19
 The question who gets a local union's assets when the local breaks away is wonderfully tangled. See, e.g., Greenberg, Disposition of Union Assets Upon Disaffiliation, 33 Temple L.Q. 152 (1960). But at least in the first instance it is a matter of contract; in the second instance equitable factors may come into play, especially in cases where the parent union expelled the local, but this is not such a case. The international's constitution may forbid disaffiliation, as we have seen. If so, then even if the prohibition is not enforceable by means of a trusteeship, because the prohibition of secession as such may not be a legitimate objective under section 302, it may still be enforceable as a matter of contract law. If Local Lodge 714 therefore has not succeeded in disaffiliating from the international boilermakers' union, the diversion of its funds to Local 15 was plainly improper--though not necessarily by virtue of the forfeiture provision, which comes into play only when a local disbands as a result of dipping below ten members, and we don't know whether Local Lodge 714 did fall to those depths, and if so whether it was automatically disbanded or somehow survived. Another possibility is that Local Lodge 714 did succeed in disaffiliating. Although that would not be disbandment within the literal meaning of the forfeiture provision, it may be implicit in that provision that the books and assets of the local revert to the international upon the departure or demise of the local; if so, the international would have a clear contractual right to them.
 
 
 20
 So where are we? The international union may appear to have a clear right to the return of its books and money, but that is not correct, because if the trusteeship is valid the trustee has the right to the books and money, while if the trusteeship is invalid the books and money presumably should be turned over to the international. In any event, a trusteeship cannot be reduced or equated to the repossession of the books and money. And regarding the trusteeship itself there must be a remand to Judge Bua for further findings (if necessary, a further evidentiary hearing) to determine whether Local Lodge 714 dipped below ten members and if so whether as a result it was automatically disbanded; for if it was disbanded, the international may not have been entitled to impose a trusteeship. Even if a remand were not necessary on this account, we would remand the part of the decision upholding the trusteeship for a further inquiry into the international's purposes in imposing it--were it not for the presumption in section 304(c). The presumption is very strong. The defendants must show by clear and convincing evidence that the trusteeship was not imposed in good faith for a purpose allowable by section 302. If only because the international appears to have had solid grounds for imposing a trusteeship because of financial malpractice, we cannot say that the defendants have rebutted the presumption--provided Local Lodge 714 did not disband before the trusteeship was voted and by disbanding perhaps place itself beyond the power of the international to impose a trusteeship; on these questions a remand is necessary. If on remand Judge Bua upholds the trusteeship, he should reinstate the injunction that we are vacating; if he vacates the trusteeship, he presumably should order the trustee to hand over the books and money of Local Lodge 714 to the international.
 
 
 21
 VACATED AND REMANDED WITH DIRECTIONS.