TILE, MARBLE, TERRAZZO, FINISHERS, SHOPWORKERS AND GRANITE CUTTERS INTERNATIONAL UNION AFL–CIO, and Tile Finishers, Local 32, a/w Tile, Marble, Terrazzo, Finishers, Shopworkers and Granite Cutters International Union, AFL–CIO, By and Through its Trustee, Fiano, Frank United Brotherhood of Carpenters and Joiners of America

v.

TILE, MARBLE, TERRAZZO, HELPERS AND FINISHERS LOCAL 32, a/w Bricklayers and Allied Crafts International Union and Tile, Marble, Terrazzo, Helpers and Finishers Local 32, a/w Tile, Marble, Terrazzo, Finishers, Shopworkers and Granite Cutters International Union, AFL–CIO, Rubino, Joseph, President, Cianciaralo, Benjamin, Vice President, Tamburine, Nazzaremo,

a/k/a Tamburini, Ned, Financial Secretary/Business Agent, Chiulli, John, Treasurer/Business Agent, Waldron, Wayne, Recording Secretary.

Appeal of TILE, MARBLE, TERRAZZO, SHOPWORKERS AND GRANITE CUTTERS INTERNATIONAL UNION, AFL–CIO and Tile Finishers Local 32, by and through its Trustee, Frank Fiano.

Appeal of TILE, MARBLE, TERRAZZO, HELPERS AND FINISHERS LOCAL 32, a/w Bricklayers and Allied Crafts International Union, Joseph Rubino, Benjamin Cianciaralo, Ned Tamburini, John Chiulli and Wayne Waldron.

Nos. 89–1540, 89–1547.

United States Court of Appeals, Third Circuit.

Argued Dec. 13, 1989.

Decided Feb. 23, 1990.

Rehearing and Rehearing In Banc Denied April 9, 1990.

Thomas W. Jennings, Thomas H. Kohn (argued), Sagot, Jennings & Sigmond, Philadelphia, Pa., Joseph J. Pass, Jubelirer, Pass & Intrieri, Pittsburgh, Pa., for appellants in No. 89–1547, Tile, Marble, Terrazzo, Shopworkers and Granite Cutters International Union, AFL–CIO and Tile Finishers Local 32, by and through its Trustee, Frank Fiano.

Robert M. Abramson (argued), Abrams, Abramson & Tabb, Philadelphia, Pa., for appellants in No. 89–1540, Tile, Marble, Terrazzo, Helpers and Finishers Local 32, a/w Bricklayers and Allied Crafts International Union, Joseph Rubino, Benjamin Cianciaralo, Ned Tamburini, John Chiulli and Wayne Waldron.

Before HUTCHINSON, COWEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal arises out of an attempt by the members of a local union to resign from their parent organization and join a competing union. The parent's response to the mass resignation was to impose a trusteeship on the local. When the former officers of the local refused to comply with the trustee's directions the parent and the trustee brought suit in federal court seeking to establish the validity of the trusteeship, an order compelling the former officers not to interfere with the trustee, forfeiture of the local's assets, and payment of per capita tax allegedly owed to the parent.

The district court held that the trusteeship was valid and that the local must transfer all of its property to the parent union pursuant to a forfeiture clause in the union constitution. However, the court found that the members of the local union had validly created a mortuary fund out of the local's treasury before they resigned and, therefore, these financial assets were not subject to the forfeiture clause. In addition, the court held that the local owed outstanding per capita tax to the parent union until the date the trusteeship was imposed, but that the local could credit against this amount the value of the property transferred to the parent pursuant to the forfeiture clause. Each party has appealed that portion of the district court's judgment that is adverse to it. Because we find that the district court was in error in finding that the trusteeship was valid and in determining the amount of per capita tax owed to the parent organization, we will affirm in part and reverse in part the district court's decision.

### I.

### BACKGROUND

Tile, Marble, Terrazzo, Helpers, Finishers Local 32 ("TMT Local 32") was first chartered by Tile, Marble, Terrazzo, Finishers, Shopworkers and Granite Cutters International Union, AFL–CIO ("International")[1] in 1922. The International was a

---

**1.** By virtue of an Affiliation Agreement signed

on November 10, 1988, the International was

relatively small labor organization with principal locals in Chicago, Detroit, Philadelphia, New York City, Bayonne, Washington, D.C., San Diego, and Los Angeles. TMT Local 32 was one of those principal locals.

As of January 1988, TMT Local 32 had approximately 246 members separated into two divisions known as Local 32 and Local 32A. Members of Local 32 worked in the Philadelphia area and members of Local 32A worked in Harrisburg. The members of the two divisions did not regularly associate and did not hold meetings or elections together. Each division separately negotiated its own collective bargaining agreements.[2]

For a number of years the International had engaged in negotiations with other unions concerning a possible merger, though nothing ever came of these talks prior to 1988. However, the negotiations did cause a certain amount of anxiety among the rank and file, and, beginning in 1987, Ned Tamburini ("Tamburini"), the business manager/financial secretary of TMT Local 32, and Wayne Waldron ("Waldron"), the recording secretary, attended various meetings on behalf of the Local where they discussed the continued viability of the International. These meetings focused on available methods by which locals could disaffiliate from the International, if desired, and still retain their assets. In addition to meeting with other locals, Tamburini held talks during 1987 with an organizer of the Bricklayers and Allied Crafts International Union ("BAC") regarding a possible affiliation with that union.

Sometime in 1987, Tamburini learned that the membership of at least five TMT locals in other large cities had, or were about to, resign and join the BAC. Fearing problems because of the weakened state of the International both in securing work for his members and in enforcing effectively the Local's existing collective bargaining agreements, Tamburini and the other officers of TMT Local 32 decided to hold a meeting to discuss resigning from the International as well. In early January 1988, postcards were mailed to all the members of Local 32 Philadelphia informing them of a special meeting to be held on January 18. No notice of the meeting was sent to the International.

Approximately 125 members—out of approximately 198 Local 32 Philadelphia members—attended the January 18 meeting. At the meeting, Tamburini told the rank and file that the International was no longer servicing their needs and that he and the other officers of the Local were going to resign and seek affiliation with BAC. Tamburini urged the membership to do the same.

Furthermore, Tamburini recommended to the membership that before they resigned they should take steps to protect the Local's assets. First, he advised them to create a mortuary fund from the existing cash assets in the union treasury. Second, he recommended that the members transfer two parcels of real estate ("the real estate") owned by the Local to him as trustee for their benefit. Both recommendations were accepted by resolution.

After passing the resolutions and holding discussions on the merits of leaving the International, all the members of Local 32 Philadelphia present at the meeting signed a "Notice of Resignation" from the International and TMT Local 32, an authorization for dues checkoff to BAC Local 32 and an authorization for representation by BAC. In the days which followed, approximately 66 more members came to the union hall to sign similar resignation forms. On January 19, 1989, BAC issued a charter to BAC Local 32, after which substantially all 191 members of Local 32 Philadelphia joined BAC Local 32.

merged into The United Brotherhood of Carpenters and Joiners of America ("UBCJA"). The district court found that because of the merger and the Affiliation Agreement, UBCJA became the successor in interest to the International's rights in this litigation. For convenience, throughout this Opinion we will continue to refer to this merged organization as the "International."

**2.** Throughout this Opinion, references to "TMT Local 32" or the "Local" will mean the combined membership unless otherwise indicated.

Members of Local 32A Harrisburg held their own meeting on January 15, 1988, at which all 30 members present resigned. The members also voted to transfer the balance of approximately $1,600 in the Local's bank account to a welfare fund established for the benefit of the members. In the days which followed, the remaining 18 members of Local 32A also signed resignation forms. On January 19, Local 32A Harrisburg received a charter as BAC Local 31 and the assets from the welfare fund were subsequently transferred to BAC Local 31's general account.

Prior to these meetings, Tamburini had met with contractors with whom TMT Local 32 was in a collective bargaining relationship ("the employers"). Although the collective bargaining agreements were not due to expire until April 30, 1989, Tamburini and the employers executed an amendment providing that the agreements between the parties would "continue to apply to the work covered therein notwithstanding any change in the identity of the collective bargaining representative, and said collective bargaining agreement will bind and inure to the benefit of any labor organization that represents the employees performing such work."

In early March 1988, Tamburini wrote to Gerald Bombassaro ("Bombassaro"), the General President of the International, informing him that as of January 18, 1988 "all of the officers and 100% of the membership" of TMT Local 32 had resigned from the union. On June 8, 1989, Bombassaro filed charges against the officers of TMT Local 32 and scheduled a hearing to determine the need for a trusteeship. A hearing was held on June 24, 1988. No officer or member of TMT Local 32 attended. After hearing testimony only from Bombassaro, the hearing officer recommended that a trusteeship be imposed, and the International's General Executive Council agreed. On July 11, 1989, Frank Fiano ("Fiano") was named as trustee of TMT Local 32.

When no property or documents of the Local were turned over to Fiano, the trustee and the International brought suit in federal court against TMT Local 32, BAC Local 32, and various of the Local's former officers.[3] The complaint alleged, *inter alia*, that the former officers of TMT Local 32 had breached their contractual obligations to the International and the Local both under the International's Constitution and TMT Local 32's Constitution. The International sought relief in the form of a judgment declaring its trusteeship valid, a permanent injunction both compelling the former officers of TMT Local 32 to deliver to the trustee all funds, books, records, papers, real property and other assets of the Local, including any assets already transferred to BAC Local 32, and preventing the officers from interfering with the trustee in the performance of his duties, and the award of any other relief the court deemed just or appropriate.

After holding an evidentiary hearing, the district court found that the trusteeship was validly imposed because of TMT Local 32's failure to pay per capita tax owed to the International, the absence of any present officers of TMT Local 32 to administer or close out the Local's affairs, and the former officers' breach of duty to the labor organization. The latter holding was premised on various actions these former officers took in contemplation of disaffiliation, including their resignation recommendation to the membership.[4]

The court also held that the forfeiture clause of the International Constitution

---

3. No entry of appearance or pleading was filed on behalf of TMT Local 32. Hoping to avoid some of the metaphysical problems associated with the identity of union locals which plague this area of the law, *see generally* Note, *Union Affiliations and Collective Bargaining*, 128 U.Pa. L.Rev. 430, 440–53 (1979), we will refer to the entity that represented the Philadelphia and Harrisburg memberships until January 19, 1988 as "TMT Local 32" and the entity which part of this combined membership subsequently joined

after that date as "BAC Local 32." Whether these entities are, or should be treated as, the same entity for at least some purposes we do not decide.

4. In addition, the district court granted the International's request for injunctive relief enjoining the former officers from interfering further with the trustee.

was valid and contractually binding on TMT Local 32. This clause requires that all the property of a local is to revert automatically to the International in the event that the local is dissolved. Because the district court found that less than seven members (if any) of TMT Local 32 desired to retain their International charter after the mass resignation in January 1988, such action constituted a voluntary dissolution of TMT Local 32. Consequently, the Constitution's forfeiture clause was triggered and TMT Local 32 was required to surrender all of its property to the International. The court concluded that the forfeiture clause encompassed the real estate because the membership's action in transferring title to the property amounted to financial malpractice, i.e., an improper disbursement of union funds among the membership. However, because of a specific provision in TMT Local 32's Constitution allowing the membership to create a mortuary fund out of the Local's treasury at any time, the court decided that the mortuary fund was not subject to the forfeiture clause.[5]

Finally, the court found that TMT Local 32 owed the International per capita tax from January 1988 until the date the trusteeship was imposed, amounting to $19,-972.45.[6] Yet, without explanation, the court, in its final order, granted the defendants a credit against the $19,972.45 judgment equal to the value of the property returned to the International under the forfeiture clause.

BAC Local 32 and the former officers appeal the district court's decision finding both the trusteeship valid and outstanding per capita taxes owed, and the district court's order that the real estate is subject to the forfeiture clause. The International appeals the court's determination that the mortuary fund was not subject to the forfeiture clause, the narrow time period used by the court in measuring the amount of per capita taxes owed, and the credit against the judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982).

## II.

### TRUSTEESHIP

The first issue we discuss is the somewhat "esoteric question of when a parent union may impose a trusteeship on a local under section 302 of the Landrum–Griffin Act (formally, the Labor–Management Reporting and Disclosure Act of 1959), 29 U.S.C. § 462 [1982]." *International Bhd. of Boilermakers v. Local Lodge 714*, 845 F.2d 687, 690 (7th Cir.1988). The district court accepted several of the International's stated reasons for imposing the trusteeship, and concluded that the trusteeship was valid. BAC Local 32 and the former officers exhaustively dispute these several reasons and, therefore, the trusteeship itself. We do not reach the issue of whether the district court was correct in determining that several of the International's stated reasons for imposing the trusteeship were sufficient under the Landrum–Griffin Act, however, because we do not believe that the International can validly impose a trusteeship on a local that has been dissolved as in the case *sub judice*.

■ Section 302 envisions a parent union imposing a trusteeship only on a "subordinate body" of that parent and only in conformity with the parent's constitution or

---

5. In addition to the real estate and mortuary funds, the district court ordered that the defendants, and those acting in concert with them, surrender to the International:
 (2) the $32 (approximately) remaining in a TMT Local 32 bank account;
 (3) the $1600 (approximately) transferred from TMT Local 32 to BAC Local 31; ...
 (4) the *original* books and records of TMT Local 32 and 32A [and]
 [(5)] ... any other property, books, records, papers, monies and documents of TMT Local 32 not already specified in [(2) through (4)].

App. at 542–43 (emphasis in the original). The defendants have not appealed the district court's order with respect to these assets.

6. This figure includes a supplemental per capita tax owed to the International for the months May 1987 through June 1988. The validity of this supplemental tax had been the subject of pending litigation from its adoption until sometime in June 1988.

bylaws. *See* 29 U.S.C. § 462 (1982).[7] Largely mirroring the Act, the International Constitution grants the International power to impose a trusteeship only on a "subordinate body." App. at 39 (Article VII, Section 1).[8] Although nowhere in the International Constitution is the term "subordinate body" explicitly defined, there is some hint in Article I, Section 5 that a subordinate body is a nondefunct, legitimately operating unit within the organization: "[e]ach of the ... subordinate bodies to which a charter has been granted shall constitute a distinct entity, each with its own separate identity, but functioning in accordance with this Constitution." App. at 25.

At any rate, the Constitution does contain the closely related, and quite typical, provisions concerning dissolution of a local and forfeiture of its assets. *See* Greenberg, *Disposition of Union Assets Upon Disaffiliation*, 33 Temp.L.Q. 152, 153–54 (1960). Thus, the Constitution provides both that: "[n]o local union shall be voluntarily dissolved while there are seven (7) members in good standing who desire to retain their charter of this International Union," App. at 45 (Article XI, Section 11) ("the dissolution clause"), and "[i]n the event a Local Union or subordinate body is

dissolved, suspended, their charter revoked in accordance with the Constitution and By-laws of this International Union, then all property, books, records, papers, monies and documents of said local union or subordinate body shall become the property of the International Union." App. at 88 (Article XI, Section 12) ("the forfeiture clause").[9]

We think it is axiomatic that a local union that has been dissolved or disbanded can no longer be considered a "subordinate body" of the International. As the Court of Appeals for the Seventh Circuit explained in a similar case involving similar constitutional provisions:

> [T]he constitution seems to make the international's right to impose a trusteeship on a local depend on the local's retaining at least ten [in our case seven] members. For if it dips below that number, [the dissolution clause is triggered and] the local disappears—there is nothing to impose a trusteeship on—and its assets revert to the international [under the forfeiture clause]. The local is no longer a subordinate body of the international; it is no sort of body; it is nothing.

*Local Lodge 714*, 845 F.2d at 692.[10] *Accord Flight Engineers Int'l Assoc. v. Con-*

---

**7.** Section 302 provides in relevant part:

> Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organizations.

**8.** Article VII, Section 1 of the International Constitution reads in relevant part:

> When the General President, Secretary–Treasurer finds, in his opinion, that action by him is necessary for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures or otherwise carrying out the legitimate objects of such subordinate body, or to protect the organization as an institution, he may file charges against any officer or member with the General Executive council for hear-

ing, or appoint a temporary trustee to take charge and control of the affairs of such subordinate body.... During the period of trusteeship, all the officers of the subordinate body are relieved of their particular trust.

App. at 39.

**9.** Significantly, the forfeiture clause compels the surrender of assets to the *International* not a trustee.

**10.** In holding that although the membership of TMT Local 32 had resigned and joined with the BAC prior to imposition of the trusteeship, such action was no bar to the imposition of the trusteeship, the district court misinterprets the analysis in *Lodge 714* and wrongly cites the case in support of its conclusion of law. In fact, *Lodge 714* stands for just the opposite as is shown by the subsequent disposition of the case. On remand, the district court first discussed the legal principles enunciated by the appellate court:

> The Court of Appeals essentially ruled that if ten or more members of Local 714 remained [after the mass defection to another union], the trusteeship imposed for financial malprac-

*tinental Air Lines, Inc.*, 297 F.2d 397, 402–03 (9th Cir.1961), *cert. denied*, 369 U.S. 871, 82 S.Ct. 1141, 8 L.Ed.2d 276 (1962); *Graphic Arts Int'l Union v. Graphic Arts Int'l Union, Local No. 529*, 529 F.Supp. 587, 593 (W.D.Mo.1982). *Cf. International Bhd. of Boilermakers v. Local Lodge D111*, 858 F.2d 1559, 1562–63 (11th Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989) (based on a similar dissolution clause, the court held that "Local D111 ceased to be a local lodge of International upon affiliation with [another union], [when] the active membership of *Local D111* fell below ten members"); *Basilicato v. International Alliance of Theatrical Stage Employees*, 479 F.Supp. 1232, 1244 (D.Conn.1979), *aff'd without opinion*, 628 F.2d 1344 (2d Cir.1980). *But see International Bhd. of Boilermakers v. Olympic Plating Indus.*, 870 F.2d 1085, 1088 (6th Cir.1989) (holding that even though the entire membership of the local resigned and the local no longer had any relationship to the International, the parent union should have the authority to impose a trusteeship to recover its assets, but misciting *Local Lodge 714* and *International Bhd. of Boilermakers v. Local Lodge*

*D474*, 673 F.Supp. 199, 202 (W.D.Tex.1987) as support for the proposition) [11].

The question confronting us then is whether on July 11, 1988, there were at least seven members of TMT Local 32 who desired that the Local retain its International charter. *See* App. at 45 (Article XI, Section 11 of the International Constitution). If not, then the dissolution clause was triggered and the International could not validly impose its trusteeship on TMT Local 32. Ironically, while on the one hand holding that the trusteeship was valid, the district court also found that "[b]ecause TMT Local 32 and 32A each (and in total) have fewer than seven members (if any) who desire to retain their TMT charter, *see* Finding No. 28, and in light of the resignations of the membership and subsequent affiliation with the BAC, ... TMT Local 32 and 32A were voluntarily dissolved by the members." App. at 566.[12] From the record before us, we cannot say this finding was clearly erroneous.

■■■ Section 7 of the National Labor Relations Act ("NLRA") guarantees a union employee the right to resign from union membership at any time. *See, e.g., Pattern Makers' League of North America v.*

---

tice was proper, and the injunction enforcing it should be reinstated. If, however, Local 714's membership fell to less than ten, the use of a trusteeship to recapture Local 714's assets was inappropriate. This determination rested on a provision in Local 714's constitution pertaining to minimum required membership. *International Bhd. of Boilermakers v. Local Lodge 714*, 696 F.Supp. 391, 392 (N.D.Ill.1988). The district court then proceeded to hold that the signatures on a petition to disaffiliate and to revoke dues withholdings was sufficient evidence of resignation. *Id.* at 393. On the basis of the signatures, the court found that Local 714's membership had dropped below ten before the trusteeship was imposed. Therefore, the court dissolved its prior injunction enforcing the trusteeship. We also do not believe that *International Bhd. of Boilermakers v. Local Lodge D405*, 699 F.Supp. 749 (D.Ariz.1988) supports the district court's conclusion. In *Lodge D405*, only 54 out of 120 members of the Lodge voted to disaffiliate prior to the imposition of the trusteeship. *Id.* at 751. Thus, the dissolution clause in that case was never triggered.

**11.** In *Lodge D474*, the trusteeship was imposed not after the international's dissolution clause had been triggered but only after the local had

*attempted* to disaffiliate, i.e., after only one-third of the membership had voted to leave the international. *Lodge D474*, 673 F.Supp. at 202–03.

**12.** Unfortunately, the district court's citation to Finding No. 28 is incorrect. It is clear, however, that the court was referring to Finding No. 32. Finding No. 32 reads in part:

All told, approximately 191 members signed resignation forms. Of the 198 members of Local 32 (Philadelphia) the seven members who did not sign forms included two "fifty year" members (one who lived outside the United States and recently died), two men from outside the Philadelphia area who "joined" TMT Local 32 while they were working on one-time jobs while in Philadelphia for periods of less than one month, and one man who stopped paying dues in August 1987 (who Tamburini forgot to remove from the membership list).

App. at 554. Contrary to the view of the International, we think it is perfectly obvious that the district court intended this Finding to mean that there were not seven members of the Local in good standing *"who desire[d] to retain their TMT charter"* in the International. *See* App. at 566 (Conclusions of Law # 15, 16).

*N.L.R.B.*, 473 U.S. 95, 106, 105 S.Ct. 3064, 3071, 87 L.Ed.2d 68 (1985); *N.L.R.B. v. Granite State Joint Bd.*, 409 U.S. 213, 216, 93 S.Ct. 385, 387, 34 L.Ed.2d 422 (1972); 29 U.S.C. § 157 (1982).[13] So long as procedures for resignation are absent from the union's constitution and bylaws, as in this case, resignation may be accomplished in any manner sufficient to show a voluntary decision to part with union membership. *International Bhd. of Boilermakers v. Local Lodge 714*, 696 F.Supp. 391, 392 (N.D. Ill.1988). In *Lodge 714*, the district court found that it was sufficient to show voluntary resignation when the membership undertook actions that were quite similar to the ones taken by the membership of TMT Local 32, i.e., signatures on a petition explicitly providing that the member was disaffiliating from the international union, revocation of checkoff authorization for payment of membership dues to the international union and a declaration of a new union as bargaining representative. *Id.* at 393 (the court also noted that "case law

recognizes that voting to disaffiliate at a union meeting constitutes voluntary resignation"). *See also Bradley v. Local 119, Int'l Union of Elec., Radio and Mach. Workers*, 236 F.Supp. 724, 729 (E.D.Pa. 1964) (combining revocation of dues authorization with submission of a signed writing communicating decision to part with union was sufficient).

■ We conclude that because virtually the whole membership of TMT Local 32 resigned during January 1988 and there was absolutely no indication that any member of the Local desired to remain with the International, no subordinate body existed on which the International could impose a trusteeship on July 11, 1988.[14] Since the International Constitution only allows it to impose trusteeships on subordinate bodies, its attempt to impose such on TMT Local 32 in July 1988 was not in conformance with its Constitution and thus violated § 302 of the Landrum–Griffin Act.[15] *See Lodge 714*, 845 F.2d at 695.

**13.** If the existing collective bargaining agreement contains a union security clause—as we were informed at oral argument the agreements in this litigation did—then a member can resign from his collective bargaining union without subjecting himself to the possibility of discharge only in the sense of surrendering full membership. In such a situation, "an employee's obligation ... is 'expressly limited to the payment of initiation fees and monthly dues.... "Membership" as a condition of employment is whittled down to its financial core.'" *N.L.R.B. v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 197 n. 37, 87 S.Ct. 2001, 2015, 18 L.Ed.2d 1123 (1967) (quoting from *N.L.R.B. v. General Motors Corp.*, 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963)). *See also N.L.R.B. v. Local 54*, 887 F.2d 28 (3d Cir.1989). "Such an employee is a 'member' of the union only in the most limited sense." *Pattern Makers'*, 473 U.S. at 106 n. 16, 105 S.Ct. at 3071 n. 16.

**14.** We also note that there is another contractual path to the conclusion that TMT Local 32 had been dissolved prior to the trusteeship. Under Article IX, Section 4, any local owing three months per capita tax is automatically suspended from the International. App. at 42. In addition, if the delinquent local is not reinstated within 30 days, the local's charter must be recalled. App. at 42. Assuming, *arguendo,* that the International is correct that TMT Local 32 owed per capita tax until April, 1989, then as of April 1988, TMT Local 32 was suspended under the International Constitution, and as of May

1988 its charter was revoked. The trusteeship was not imposed until July 1988.

**15.** We believe our analysis of the trusteeship issue clears up a fundamental inconsistency both in the district court's opinion and in the International's arguments to this Court. In its opinion, the district court found the trusteeship valid, yet based its determination that the Local must surrender its assets not on the powers of the trustee under Article VII, Section 3 of the International Constitution but on the forfeiture clause, Article XI, Section 12 of the International Constitution. However, the forfeiture clause is only triggered when the local is no longer in existence (or suspended). *Cf. Lodge 714*, 845 F.2d at 695. As we have discussed, in such a situation the assets of the dissolved local would revert not to a trustee, but the International itself. This clause clearly envisages a reversion in situations where there simply is no trustee involved, and its automatic mechanism makes the same unnecessary.

Furthermore, our conclusion is not inconsistent with *International Bhd. of Boilermakers v. Kelly*, 815 F.2d 912 (3d Cir.1987). In *Kelly,* a trusteeship was imposed on a local well before both the membership voted to disaffiliate and the NLRB certified the new bargaining representative. *Id.* at 914. Our holding in that case was simply that subsequent disaffiliation events do not moot the question of whether the trusteeship was valid *when initially imposed* and, therefore, wheth-

■ Our conclusion that the trusteeship is invalid does not decide the question of who keeps the assets of TMT Local 32. The International Constitution is, as a matter of law, a contract between the International and its subordinate bodies. *United Assoc. of Journeymen v. Local 334*, 452 U.S. 615, 619, 101 S.Ct. 2546, 2548, 69 L.Ed.2d 280 (1981). According to the International Constitution, each local is subject to all of its provisions. App. at 25 (Article I, Section 5). As we have seen, one of those provisions is the forfeiture clause. Such clauses have been uniformly upheld as furthering important public policies such as the stability of labor organizations. *See, e.g., International Bhd. of Boilermakers v. Local Lodge D111*, 681 F.Supp. 1570, 1574 (S.D.Ga.1987), *aff'd*, 858 F.2d 1559 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989). Since TMT Local 32 was dissolved, the Constitution's forfeiture clause was triggered. Thus, the International can obtain a remedy in federal court, under § 301 of the Taft–Hartley Act, 29 U.S.C. § 185 (1982), for breach of contract if the former officers of TMT Local 32 improperly retained the mortuary fund and the real estate after TMT Local 32 was dissolved. We now turn to examine this issue.

### III.

### ASSETS OF TMT LOCAL 32

■ In an action arising under § 301, the substantive law to be applied " 'is federal law, which the courts must fashion from the policy of our national labor laws.' " *United Assoc. of Journeymen v. Local 334*, 452 U.S. 615, 627, 101 S.Ct.

2546, 2553, 69 L.Ed.2d 280 (1981) (quoting from *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957)).[16] Our federal labor laws clearly regard labor organizations as entities that can sue and be sued, and own and dispose of assets. *See, e.g.,* 29 U.S.C. §§ 185(a), (b), 431(b), 501(a) (1982). Indeed, federal jurisdiction was created under § 301, at least in part, to protect this very status accorded labor organizations under federal law but often denied to them under state law. *Local 334*, 452 U.S. at 624, 101 S.Ct. at 2551. Both the International and Local 32's Constitution adopt this "federal" view. *See, e.g.,* App. at 25 (Article I, Section 5 of the International Constitution); App. at 78 (Article V, Section 12 of the Local Constitution).

■ The district court found that, prior to the January 1988 special meeting, TMT Local 32 owned the funds existing in its treasury, as well as an undivided one-third interest in two parcels of real estate comprising the Local's office building and a vacant lot. *See* App. at 553–54.[17] Barring a change in ownership, upon dissolution of TMT Local 32, these assets would automatically revert to the International under the forfeiture clause.

■ In a deliberate attempt to avoid the effects of the clause, the members of TMT Local 32 passed two resolutions at the January 1988 special meeting immediately prior to resigning from the International. The first resolution established a mortuary fund, for the benefit of the then-existing members of Local 32 Philadelphia, in an amount not to exceed one hundred percent of the cash assets of Local 32 Philadelphia.

---

er the trustee is presently entitled to control the local's assets because of the validity of the action when taken.

**16.** Since the enforcement of union constitutions is a matter of federal concern, to the extent state law is used to frustrate the binding provisions of such a constitution, it should be disregarded. *Hansen v. Huston*, 841 F.2d 862, 864 (8th Cir. 1988). Therefore, to the extent Pennsylvania law conflicts with the principles involved in enforcing forfeiture clauses which we advance in this discussion, we reject it.

**17.** We note that this finding is not clearly erroneous given the treatment of the real estate by the officers of TMT Local 32. Thus, for example, the financial statement for the year 1987 submitted by Tamburini for TMT Local 32 pursuant to the Landrum–Griffin Act, 29 U.S.C. § 431 (1982), treated the Local as owning a one-third interest in the Tri Union Association, the entity created to nominally hold the real estate. App. at 516. Moreover, the financial statement prepared by TMT Local 32's certified public account for the year ending 1987 also lists the Local as owning the real estate. App. at 186.

The resolution provided that Tamburini and John Chiulli, the treasurer of the Local, should hold such funds as trustees for the members. The second resolution authorized the Local's officers to transfer the real estate owned by TMT Local 32 to Tamburini as trustee for the benefit of the members of the Local or any union with whom a majority of the members might become affiliated. Because both of these actions were taken by the members in contemplation of disaffiliating with the International and joining BAC, the transfer of ownership rights in the treasury funds and real estate of TMT Local 32 was not made for the benefit of the labor organization *and* the organization's members. *See* App. at 24 (the Preamble to the International Constitution); App. at 25 (Article I, Section 3, listing the purposes of the union). Thus, we believe the resolutions amounted to improper disbursements of union funds unless there is specific authorization in either the International or Local Constitutions for such actions.

■■■■■ First, with regard to the creation of the Mortuary Fund, there is such authorization in Article XII of the Local Constitution:

> Section 2. The local union may establish death benefits or other types of benefits. All such death benefits or other types of benefits shall be submitted to the membership for their approval before same becomes effective.
>
> Section 3. Under no circumstances shall any plan for death benefits require the comingling [sic] of said funds with the general funds of the local union. . . .

App. at 72. Therefore, the transfer of the Local's treasury funds to a mortuary fund for the benefit of the members of Local 32 Philadelphia was not an improper disbursement per se.[18]

■■■■ However, the International contends that this particular death benefit disbursement, while authorized by TMT Local 32's Constitution, conflicts with Article V, Section 12 of the International Constitution which provides that:

> The financial obligation of a local union shall be fixed and regulated within the income of the local union. A local union shall make no disbursements which will preclude or interfere with its ability to first meet its financial obligations to the International Union.

App. at 78.[19] The International argues that since the district court found that TMT Local 32 owed per capita tax from January 1988 to June 1988, as well as supplemental tax for the same period, the depletion of the Local's treasury precluded it from meeting these "financial obligations to the International Union."

We disagree. It is undisputed that, as of the special meeting on January 18, 1988, TMT Local 32 was fully paid up with respect to its per capita tax.[20] Furthermore, the Local did not owe any supplemental per capita tax as of January 1988. The validity of this tax was the subject of pending litigation at the time and the International had acquiesced in the non-payment of the tax until the litigation was resolved. It was not until June 1988 that this contingent liability became actual. Therefore, we conclude that at the time of the special meeting on January 18, 1988, TMT Local 32 had no financial obligations to the International and thus Article V, Section 12 did not bar the mortuary fund disbursement.[21]

---

**18.** The International's argument that the transfer violated the commingling provision of Article XII is frivolous. The prohibition against commingling has nothing to do with the source of the funds used for creating the mortuary fund, but simply requires that once a mortuary fund is established the funds are not to be mixed with general union funds.

**19.** The International Constitution preempts the Local Constitution whenever the two conflict. App. at 45 (Article XI, Section 7 of the International Constitution).

**20.** The Local also paid its January 1988 per capita tax when it officially came due.

**21.** The case that the International primarily relies upon in its argument, *Meyer v. Barnes,* 867 F.2d 464 (8th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 86, 107 L.Ed.2d 51 (1989), is clearly distinguishable. In *Meyer,* the court found that the outgoing executive board's action in voting themselves a large severance payment violated a similar constitutional provision. *Id.* at 466. However, unlike our situation, the local in *Meyer* was already in an incredibly difficult finan-

■ We find it unreasonable to interpret Article V, Section 12 as requiring a local to retain in its treasury sufficient funds to enable it to satisfy any future obligations to the International that may possibly arise beyond the normal ones anticipated for that month. In the normal course of events, the Local's treasury would be continually replenished by membership dues, enabling it to meet any future obligations as they were incurred. We see no reason to adopt a different view under the unique circumstances that now confront us. The Local paid its obligations for January 1988 and anticipated no further liabilities to the International because it was dissolving. Indeed, as we discuss in section IV, *infra*, had the Local given the International notice in January 1988 of the mass resignation of its membership, the International would be entitled to no further per capita dues beyond that month. For the foregoing reasons we will affirm the district court's judgment holding that the mortuary fund assets were not subject to the forfeiture clause.

■ A different analysis applies to the real estate. There is no specific authorization in either the International or the Local Constitution permitting the membership to transfer real estate owned by TMT Local 32 to another organization, or the members of another organization, at least where the purpose of that transfer serves no TMT Local 32 purpose and provides no benefit to TMT Local 32 as an organization. In the absence of such a specific authorization, the disbursement of the real estate was improper. Thus, when the real estate was not surrendered to the International after TMT Local 32 was dissolved, there was a breach of the Local's contractual obligations. We will affirm the judgment of the district court ordering the former officers of TMT Local 32 to surrender the real estate to the International as an equitable remedy for this contractual breach. *See International Bhd. of Boilermakers v. Local Lodge D504*, 866 F.2d 641 (3d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 59, 107 L.Ed.2d 27 (1989).[22] *Cf. Hansen v. Huston*, 841 F.2d 862, 863–65 (8th Cir.1988) (affirming district court order compelling directors of a non-stock, non-profit corporation that had been formed by a local union to hold title to the local's real estate to deliver to the trustee all the corporation's books, records and assets).

## IV.

## PER CAPITA DUES

■ The district court found that since Article IX, Section 1 of the International Constitution obligated TMT Local 32 to pay per capita tax to the International, the Local was in arrears from January 1988, the last month for which tax had been paid by the Local, to June 1988, the month immediately proceeding the imposition of the trusteeship. The court evidently chose June 1988 as the cut-off date for tax liability based on equitable grounds: "in light of the facts known to [the International] including ... Tamburini's letter informing [the International's] President Bombassaro in March 1988 of the resignation votes of the membership and also the failure of any TMT Local 32 members to attend the trusteeship hearing, the amount of per capita taxes owed by TMT Local 32 to the [International] is limited to $19,-972.45 [the amount owed as of the date the trusteeship was imposed]." App. at 559. BAC Local 32 argues that since per capita tax is based on the number of members a

cial situation. All parties in *Meyer* agreed that prior to the severance action the local owed creditors $1,750,000. *Id.* at 467. The former board members' argument was that given this extraordinary debt, an additional debt of $191,-000 in severance payments was insignificant. *Id.* The court, naturally, rejected this argument, stating that the additional debt would only further burden the local and interfere with its existing obligations. *Id.* There is no comparison between the financial status of the local in

*Meyer* and TMT Local 32 at the time the special meeting was held in January 1988.

22. In *Lodge D504*, the membership also placed their assets in trust before resigning from the union. *Lodge D504*, 866 F.2d at 643. Nevertheless, we held in that case that the trust assets were subject to the forfeiture clause. We see no reason to treat the assets in *Lodge D504*, i.e., treasury funds, differently than the assets in this case, i.e., the real estate.

local union possesses, TMT Local 32 owed no per capita tax after January 1988 because the entire membership had resigned from the union during that month. The International counters that regardless of whether the Local or its membership believed that they had disaffiliated from the International, our decision in *International Bhd. of Boilermakers v. Local Lodge D504*, 866 F.2d 641, 647 (3d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 59, 107 L.Ed.2d 27 (1989), dictates the conclusion that a local is obligated to pay per capita tax until either a decertification election is held or the existing collective bargaining agreement terminates.

Although each of these positions has its appeal, we do not adopt any of them. Addressing the International's argument first, we do not believe that our decision in *Lodge D504* controls the unique circumstances of the case *sub judice*. In *Lodge D504*, the members of several local lodges resigned from the Boilermakers Union, stopped paying their per capita tax, and then joined with another union, the Independent Workers of North America ("IWNA"). *Id.* at 643. We held that "per capita tax is due from the Local Lodges for each member until the date of [a National Labor Relations Board ("NLRB")] decertification [election] provided the member remained employed and remained a member of the Local Lodge regardless of whether the Lodge considered itself disaffiliated and regardless of a particular member's belief that he was or was not a Boilermaker." *Id.* at 647.

This conclusion was premised on a concern for stability in the workplace. In *Lodge D504*, there appeared to be real confusion over who was the proper bargaining representative for the workers who had resigned from the Boilermakers Union. Although the Boilermakers Union was the Board certified sole bargaining representative, the members of each local lodge involved in the litigation had voted to disaffiliate. *Id.* at 643. Importantly, there was no indication in the case what the employers' response might be to the local lodges' disaffiliation moves. Apparently anticipating a claim of schism by the employers and

a suspension of their bargaining and contractual duties, *see generally Brooks v. N.L.R.B.*, 348 U.S. 96, 98, 75 S.Ct. 176, 178, 99 L.Ed. 125 (1954); Note, *Union Affiliations and Collective Bargaining*, 128 U.Pa.L.Rev. 430, 443 n. 71 (1979), the IWNA petitioned the NLRB for a certification election to resolve the confusion. *Id.* Moreover, the Boilermakers Union evidently did not receive sufficient notice of the disaffiliation vote because it did not invoke its forfeiture clause until *after* it had lost the decertification election. *Id.*

Thus, in *Lodge D504* it was the parties involved who initially chose the NLRB election process to resolve the representational question. Consequently, we believe it is wrong to interpret our holding in *Lodge D504* as *mandating* an NLRB decertification election in every affiliation/disaffiliation context before per capita tax liability can be terminated. Rather the proper rule to be gleaned from our decision is that per capita tax is owed to the existing bargaining representative until any confusion over representation is resolved. This will most likely entail a fact-sensitive examination in every case. In *Lodge D504*, this Court simply looked at the facts of the case and decided that the natural and fair cutoff point was the decertification election.

The important difference between *Lodge D504* and the instant case is that in the latter there was never any confusion as to who represented the former membership of TMT Local 32. In January 1988 virtually the entire membership of TMT Local 32 resigned from the International. No former member of the Local has ever objected to that action or to the new affiliation with BAC. Moreover no party has petitioned the NLRB for a certification election, nor instituted any complaints with the NLRB as to BAC Local 32's representative status. Finally, and most importantly, the employers, in keeping with their past history of voluntarily recognizing TMT Local 32 as the sole bargaining representative of their workers, voluntarily recognized BAC Local 32 as the workers' new representative after virtually

the entire membership of TMT Local 32 had resigned and joined that union.[23]

In reviewing these facts, the district court found that: "in light of the modification to the existing collective bargaining agreement with local employers [in effect, substituting BAC Local 32 as a party thereto] ... and the fact that essentially 100% of the active members of TMT Local 32 resigned and joined BAC Local 32, ... *no confusion existed as to who represented the workers involved.*" App. at 560 (Finding of Fact No. 49) (emphasis added). The International provides us with no legal authority for their assertion that a Board decertification election is a legal, or even a pragmatic, necessity in this situation. On the contrary it would appear that since BAC Local 32 apparently agreed to abide by the existing collective bargaining agreements and the workers involved clearly wished to affiliate with that union, the practical result in this case dovetailed with the twin aims of our national labor laws: preserving stable bargaining relationships based on existing collective agreements and guaranteeing to workers their free choice in bargaining representative. *See, e.g.*, 29 U.S.C. § 401 (1982). *See generally* Note, *supra* typescript p. 26, at 433. Since the stable workplace concern of the *Lodge D504* decision is simply absent from this case, we think it would be inappropriate to judicially impose a decertification election on parties in this unique type of situation in order to terminate per capita tax liability.[24]

Of course, our rejection of *Lodge D504*'s cut-off date leaves us with the problem of fashioning a new one for the instant case. In the absence of any legal or pragmatic necessity for a decertification election, BAC Local 32's argument that once the

membership had resigned in January 1988, no further per capita taxes were due, appears persuasive. Yet, we decline to adopt this suggestion for equitable reasons. TMT Local 32 did not provide the International with notice of the January 1988 special meeting and thus the International did not attend nor receive actual knowledge that the membership had resigned during that month. Without such notice, the International continued to provide the membership of TMT Local 32 with support services, e.g., the payment of insurance premiums. *See Lodge D504*, 866 F.2d at 647 (explaining that a secondary rationale for the tax liability holding in the case was that "the Boilermakers provided support services to the Local Lodges until decertification"). We believe it is unfair to saddle the International with the burden of discovering when its local memberships have resigned, especially in situations where the local intentionally tries to keep the International in the dark until sometime after the fact.

 Instead, we agree with the district court that the proper resolution of this problem is to chose as the cut-off date the date on which the International received full and adequate notice of the mass resignation; however, we disagree with the district court on what date that was. The district court chose the date on which the trusteeship hearing was held, i.e., June 24, 1988. We find that this does not give enough weight to the letter Tamburini sent to Bombassaro around March 4, 1988 informing the International that "all of the officers and 100% of the membership" of TMT Local 32 had resigned.[25] Evidently, *no* action was taken by the International as a result of this letter. A trusteeship hear-

---

**23.** Thus, we are not concerned here with whether, according to the doctrines of continuity of representation or due process, the employers would be guilty of an unfair labor practice if they were to refuse to recognize BAC Local 32 or abide by the existing collective bargaining agreements. *See N.L.R.B. v. Bernard Gloekler North East Co.*, 540 F.2d 197 (3d Cir.1976); *American Bridge Div. v. N.L.R.B.*, 457 F.2d 660 (3d Cir.1972). Of course, any such question, if it was raised, would be for the Board to determine in the first instance.

**24.** Or, alternatively, compel the local to pay taxes until the collective bargaining agreements have expired, which in this case was approximately a year and four months after the special meetings were held.

**25.** It also is somewhat arbitrary given our holding in Part II that the trusteeship is invalid.

ing was not held for another three months, notwithstanding the fact that almost all of the International's reasons for imposing the trusteeship were based on events prior to, at or immediately after the January 18, 1988 meeting. The *only* additional information the International received at the hearing was that no officer or member of the Local cared enough to attend. But, importantly, it is the March 4 letter which provides the rationale for this lack of concern.

We conclude that the March 4 letter to Bombassaro provided the International with full and adequate notice that the membership of TMT Local 32 had resigned. Since TMT Local 32 paid per capita taxes for January 1988, one month's taxes are still owed, as well as supplemental per capita tax from May 1987 until, and including, February 1988. Because this amount cannot be determined from the record before us, we will vacate this part of the judgment and remand to the district court to calculate the specific amount.[26]

## V.

## CREDIT

In its judgment order of May 31, 1989, the district court, without explanation, granted BAC Local 32 and the former officers a credit, equal to the value of the assets ordered by the court to be turned over to the International pursuant to the forfeiture clause, against the $19,972.45 worth of per capita taxes the court found was owed to the International. App. at 543. Since we will vacate the judgment as to the amount of per capita taxes owed and remand to the district court for a new determination, we technically need not address the appropriateness of this credit. However, we wish to comment upon this aspect of the judgment order because the issue will likely resurface.

The International argues that it was an abuse of discretion for the court to off-set one debt against another because nothing in the record justifies such a credit. BAC Local 32, while acknowledging that the district court provided no rationale for the credit, offers the following explanation for it:

> The trial court ... concluded that the only way the dues it found were owed by TMT Local 32 to the [International] could be paid would be out of the aforementioned TMT Local 32 assets found to exist and ordered returned to TMT Local 32.

Brief for Appellee at 38.

---

**26.** The International and the trustee of TMT Local 32 also state that the district court erred in failing to address the issue of field dues. As in the case of per capita taxes, they argue that the field dues provided for in the collective bargaining agreements between TMT Local 32 and the employers—which have been collected by BAC Local 32 since January 1988—should be turned over to the International because these agreements are binding until April 1989 when they expire. This argument is confused. The purported trustee is barred by our holding in Part II from asserting any rights to the field dues, and the International simply has no contractual claim to such dues. Field dues are the membership dues owed by individual members of TMT Local 32 *to the Local. See* App. at 71 (Article X, Sections 1–7 of the Local Constitution). The checkoff procedure, negotiated by the parties to the collective bargaining agreement, to which the International was not a party, is simply an administratively easy and efficient way for the Local to collect its membership dues. Under the International Constitution, the International is only entitled to per capita tax and registration fees for new members, not field dues. *See* App. at 41–42 (Article IX of the International Constitution); App. at 84–85 (Resolution # 5 adopted at the 1986 International Convention). While it is true that the per capita tax may ultimately come from the Local's treasury which in turn contains field dues that have been "checked off" by the employers and sent to the Local, this does not give the International a contractual claim to both the per capita tax and the field dues. Furthermore, the employers are not parties to this action, so even *if* some entity has a claim against the employers for violating the collective bargaining agreement by sending the checkoff dues to an improper party, that issue is not before us. Thus, since neither plaintiff in this action had a valid claim to the field dues collected by BAC Local 32, the district court did not commit reversible error in failing to address this issue.

However, this explanation is not a justification and is seemingly inconsistent with the plain meaning of other aspects of the judgment order. For example, the district court's order, awarding the plaintiffs in this action the amount of $19,972.45, was against the "defendants." No limiting language was provided by the court. BAC Local 32 was certainly a defendant in this action. A natural reading of this aspect of the order then is that the district court apparently found BAC Local 32's close affinity to TMT Local 32 sufficient to hold it liable, under successorship principles, for the outstanding debts of the old Local.[27] *See International Bhd. of Boilermakers v. Local Lodge D504*, 866 F.2d 641 (3d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 59, 107 L.Ed.2d 27 (1989) (affirming money judgment against both the new local, with whom the membership of the old local had joined, and the former officers, after the old local had disbanded). We advise the district court that in formulating its new judgment order on remand it should clear up this difficulty and state its reasons for granting a credit, if the court still deems such a credit is proper.[28]

## VI.

### CONCLUSION

To summarize, we disagree with the district court's determination that the International validly imposed a trusteeship on TMT Local 32. We find that TMT Local 32 had dissolved prior to the imposition of the trusteeship which rendered the trusteeship invalid. However, we will affirm the court's judgment that the mortuary fund is not subject to the forfeiture clause of the International Constitution, but that the real estate is. Finally, we will vacate the court's decision that $19,972.45 in per capita tax is still owed to the International and remand for a new determination of the amount owed consistent with this Opinion. Each party to bear its own costs.

---

27. We note that BAC Local 32 has not sought to clarify the judgment order.

28. The International raises two other issues on appeal, neither of which have merit. First, the International argues that the district court erred in failing to resolve the question of whether the payment of $25,000 to TMT Local 32's counsel prior to its dissolution was a proper disbursement of union funds. Since the International failed to raise this issue in the district court, we decline to address it for the first time on appeal. *Page v. Schweiker*, 786 F.2d 150, 153 (3d Cir. 1986); *Patterson v. Cuyler*, 729 F.2d 925, 929 (3d Cir.1984); *Toyota Indus. Trucks U.S.A. v. Citizens Nat'l Bank*, 611 F.2d 465, 470 (3d Cir.1979); *Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932–33 (3d Cir.1976). Second, the International contends that the district court failed to address its state breach of fiduciary duty claim against the former officers of TMT Local 32. However, the International fails to appreciate the court's Finding of Fact No. 48: "The individual defendants did not embark on a plan or scheme to dissipate the assets of TMT Local 32, but instead acted in what they believed to be the best interests of the members of TMT Local 32 and acted solely to preserve the money and property which they believed belonged to those persons." App. at 559–60. *Cf. Graphic Arts Int'l Union v. Graphic Arts Int'l Union, Local No. 529*, 529 F.Supp. 587, 594 (W.D.Mo.1982) (under similar facts holding that a local's officers did not violate their fiduciary duties under 29 U.S.C. § 501 (1982) when "action taken by the officers … was in good faith reliance upon and in response to [the approval of the membership after full disclosure]").